Good afternoon. Illinois Appellate Court First District Court is now in session. The 6th Division, the Honorable Justice Michael B. Hyman presiding, case number 23-0949, Brian Ball v. Chicago White Sox. Good afternoon. I'm Michael Hyman. With me is Justice Carl A. Walker, Justice Celia Amras. We will conduct this proceeding as if we were in a court. You each have 20 minutes. Mr. Winters, you can reserve time for rebuttal. Let us know when you introduce yourself, how much time you wish. We may interrupt you. And you should know that we're not real strict in the 20 minutes. If there's more to be asked and more to ask your answer to the question, we're not going to cut that off. So if you don't have any questions, Mr. Winters, please introduce yourself. Good afternoon. John Winters, Jr. on behalf of the appellant, Brian Ball. And how much time do you want for? I would reserve five minutes, just five minutes for rebuttal, Judge. Thank you. Jackson. I'm sorry. Good morning, Your Honor. Brian Jackson for the appellee Chicago White Sox. Thank you very much. OK, Mr. Winters. May it please the court. Counsel, we are here this afternoon on a case that is not only having great importance to. The plaintiff, in this case, Brian Ball, but also has potentially far reaching ramifications for the entire LGBTQ professional community. And certainly has ramifications for Major League Baseball. Brian Ball was one of 32 head trainers at the time of his termination. He was and is the open only openly gay head trainer in Major League Baseball. Now, the briefs have been submitted. I know the justices, you've all reviewed the briefs. And there are many issues that have been raised in those briefs. I'm only going to focus on one, if maybe two. And that's it. At this point in the litigation, there has been no discovery performed. There's no written discovery, no depositions. The only thing that was a part of the pleadings would be the complaint that law filed by the plaintiff. Of course, there are briefs that were filed with the motion to dismiss this being a 2619 motion to dismiss. And there's also more than two, but there are affidavits. Yes. Approximately four affidavits. But this is what is basically a wedge in the plaintiff's complaint. It has to be taken as true in the light. Yeah, I don't think you need to repeat what's in the complaint. I mean, we've read the complaint. We've read the briefs. Sure. What is the first argument you'd like to follow? The first argument is based on the fact that the Chicago White Sox through their general manager, Mr. Han, on October 26, 2020, terminated Brian Ball because he because of his sexual orientation, that being a homosexual. That is in the complaint. There's no response to it as not being true. Mr. Han. So let me just stop you right there. So there's no response to it anywhere. In the. But by the White Sox, not in the affidavit, correct? Correct. They don't the White Sox do not claim they did not terminate Brian because of him being homosexual. OK, so with that. Information. The White Sox say in their brief that they had no duty. To speak. And you're saying that. Are you saying something else? Yes, I am saying that they definitely had a duty to speak because they're violating not only state law and the Illinois Human Rights Act, but federal law. And what was the. What does that duty derive from? Duty derives from fraudulent concealment, fraudulent misrepresentation. But that's that's the result of not saying anything. But what is the duty that they had to speak up? Well, they had a potential, well, not a potential. They had a business relationship being that Brian worked for the White Sox and he was one of their. Uniform employees, he had a uniform employee contract. OK, what does it what what relevance does that have that it was a uniform rather than a non uniform employee country? Well, that's something that maybe the White Sox could speak better to than I can. I know the uniform employee contracts are those that were suspended for a period of time by the commissioner baseball in which the commissioner baseball directed that the teams directed to the individuals who had a uniform employee contract. That the teams are going to handle the situation in their own way, in their own manner. When you say situation, you referred to covid. Yes. Back in I think it was April in 2020 when the commissioner finally came out and sent out a memorandum that was very ambiguous that these contracts, uniform employee contracts were going to be suspended. But the players were to rely on the contact that they had with the team as to how it was going to be handled going forward. So here's something that seems a little odd to me is that they knew his sexual orientation in April of 2018. And in December of 2018, that's when he was promoted. So it doesn't seem like that they were punishing him based on his sexual orientation. I understand your question, Justice. The reason why Brian was promoted in December of 2018 was because that the longtime trainer, Herm Schneider, who had been there for over 35 years, suddenly and unexpectedly retired. Now, if you're familiar with baseball, when December comes, they're already getting started. The training and the strength training people and the head trainers are already getting ready to go down to spring training. They have to be there ahead of time so that they can set things up to best help the players during the season or at least during spring training heading into the season. So Brian's promotion at that point was more or less we have to do it type of thing. He's been here 20 years, and I'll tell you, Brian won some awards and accolades as an assistant trainer and as a head trainer. So that was the circumstances. And I'm not saying that originally when Brian was disclosed his homosexuality, I think it was in February of 2018, that the White Sox all of a sudden were going to dismiss him based on sexual orientation. What motivations the White Sox had for doing this in October of 2020, I don't want to disclose what my beliefs are at this point in the litigation, but I think that there are some. And I think it speaks to when you look at what transpired with Brian in 2020. He's going down to spring training, getting things set up. He's approached by an assistant GM and told, we are going to change your title from head trainer, and we're going to give you a title where you're not going to have hands on with the players. We don't want you to do that. Okay? What happens next is then we have the pandemic. And then we have the suspension of the contracts. Baseball stopped for a period of time. I believe it's late May or early June when baseball starts again. But during this entire time, from December, January, February, March, April, May, Brian is working as the head trainer. Never stopped working, even when they say contracts are being suspended. Brian continued to work. But that was because they allowed him to continue to work, Mr. Winters, correct? Sure. He had a two-year contract. Okay? No, no. I agree.  So I'm referring to 2020. I'm referring to 2020. When he gets promoted in December, it's because 2019, they need a trainer. And they need a head trainer, and they need him right away. And the most available and probably the most talented was Brian. So he went through 2019 as the head trainer. What went wrong between 2019 season being completed going into 2020? What was the difference that they come to him in February and say, we're going to change your title? You're not going to be the head trainer. We're going to make you the head of everything. You don't have contact with the players. That's the first sign that something's wrong. That's the first sign. The second sign comes after the season starts, and Brian, in the course of his duties as the head trainer. It looked like, Mr. Winters, wasn't that another promotion, though? There was no promotion. They only came to him and told him that. Everything stopped because of the pandemic. He was never given a new position. He was never given a new promotion. That was something that was suggested to him, that he would not have hands-on relationships with the players. I'm saying that's the first red flag.  Let's move on to the whole issue of consideration, because the trial court found that there was consideration, and that the consideration for the agreement, that is, that the consideration was that he received his payment, which was, I believe, according to the record anyway, it was over $100,000 a year, and he continued to receive that, and he also received health insurance. And I think those are the two things that the trial court used to find that there was consideration. Do you want to respond to that? Sure. First off, let me just – Because you argued there was no consideration. Yeah, absolutely. You're correct. And first off, the reason why there is no consideration is because the separation agreement is void. It's void because it flows from an illegal act. The illegal act is terminating Brian Ball because he is a homosexual. So everything that flows from that act becomes illegal. So once the separation agreement is void, there is nothing left except for Brian Ball's two-year contract that was signed in, I believe, 2019 and was going to run to October of 2021. That's the only thing that is left. Now, even if you want to say that somehow that separation agreement is still in effect, well, Brian's contract was basically after the commissioner's memo was ratified by the White Sox. He continued to work in the same manner, continued to get paid in the same manner. He continued to have the health benefits in the same manner. Everything was in the same manner. The only person that could possibly explain what was the true intent of the commissioner's memorandum in April of 2020 is the commission. Nobody else can speak to that. But something you put in your complaint, and obviously the complaint is taken as true under 619. And in the complaint, you say the termination date in the separation agreement, October 31, 2020, contained a 12-month severance package that is identical to the provisions of the two-year contract. So accepting that allegation, which we must, where is the consideration? Because they owed him, under the contract, they still owed him a year of compensation and benefits. I agree, Ron. There was no. Is there something I'm missing?  You're right on. There was no consideration because Brian is getting everything that he would have received under the two-year contract. Go ahead. Oh, sorry. You said that the National League suspended the contract. What effect did that have on Mr. Ball's two years? Did that mean that that two-year contract stopped once the National League said all contracts were suspended? That's a very good question, Justice, and I'll try to answer it by saying take a look at the memo issued by the Commissioner of Baseball, Mr. Manfred. He says that the teams individually will now tell you, you uniformed employee contract people, how it's going to be handled. So how did they handle it with Brian Ball? They continued to pay him in the same manner, the same amount, the same health benefits, and they, on more than one occasion, told Brian, you are going to continue to be a head trainer here for a long time. Right, but that's what I wanted to jump into. It's my understanding from the record that it was Han who told him that, and that Han, the argument, at least, that they make is that Han had no authority to tell him that. You're arguing that they subsequently ratified it by agreeing to pay him the pursuance of the contract and also provide for the health insurance. Well, let me answer it this way. Rick Han was a general manager of the Chicago White Sox. Rick Han is the one who hired Brian and the one who fired Brian, okay? He had authority to do that. Howard Pizer, as the vice president of the baseball operations, he had the authority, and it's indicated in some of the pleadings that they did file later through a, I believe it was a memorandum or an affidavit. I think it was an affidavit that said that he had no authority. Pizer had more authority over the non-uniformed player, non-uniformed contracts. There's a difference between uniformed contracts and non-uniformed contracts. Now, the White Sox wanted to say, well, Brian was a non-uniformed, uniformed contract employee. There is no such designation. His contract says uniformed employee contract. It's a contract that's held by the major league players, some of the coaches, some of the staff, such as Brian, and a couple of team's announcers. They're contracts that are given out. So, Howard Pizer – They're arguing that, okay, Han made these promises that he'd always have a job. The White Sox is arguing that they never made that promise to him and that Han had no authority to make that promise to him. Therefore, when they decided to pay him pursuant to his signing of the agreement, that they were – his consideration was to receive this payment of $100,000 plus a year plus his health insurance. That was – they're arguing that was his consideration. Well, I believe Han is – And the trial court obviously agreed with that. I didn't mean to cut you off, but the trial court obviously agreed. I understand that. But Mr. Han, as the general manager – Justice, I know you know about baseball, and I know you know what a general manager does and what authority – Absolutely. And I think we all do. Everybody here does. We all really did everything, by the way. Sure. All three of us. I agree, and I'm sure you did. But to suggest that Rick Han had no authority, to me, is ridiculous. And at best, I say at worst, it's a question of fact for a jury to decide. Did he have the authority or not? Being that he's the one that hired and he's the one that fired Brian. So then you're saying if you're going to take what you just said, the White Sox then, they never fired Brian because Rick Han never had the authority to fire Brian, if that's true. When it's clear, he had the authority because he's the one that came to Brian, even though he had told him a month ago that you're going to be here for a long time. I just want to touch on one other thing because we talked a little bit about what was happening during this time period. After the season had started, Brian was involved in a carjacking where the car was – We're aware. But I want to point out that following that carjacking, not only did the White Sox all of a sudden require him to seek psychological evaluation in order to return to work, they had contact with his psychologist. It's a HIPAA violation. Not only after that, they start talking to other members in the training department and the strength coach about Brian having a drinking problem, Brian having a gambling problem, or addicted to cocaine or something. Why is that important? Because it's showing, again, the White Sox, first, we're going to give you a title with your hands off. Next, well, we're going to try to violate your – you violated your contract on moral turpitude. None of that worked. None of that worked. So they felt that all of a sudden, after ratifying everything Brian did for them and ratifying his two-year contract, even though the suspended contracts memo came out in, I believe, in April of that year, they come to him and tell him, you're going to be fine, don't worry. And then comes October 26th, a phone call saying, Brian, we're going to let you go. When Brian asked why, you don't fit in to get to the next level. You don't fit in. Brian Ball was there in 2005 as an assistant trainer when they won the World Series. Brian Ball had won accolades, not just from baseball, but also being – What about – yeah, we know the fact. Okay. Are there any other questions? Because your time is about up. If you could summarize and then – Sure. You'll have your five minutes. Justices, I just believe, once again, the illegal act, it's a violation of state law, federal law, and the opinion in Bostock versus Clayton County, Georgia. Their act is illegal. Everything that flows from it becomes illegal and void, too. The only thing left was the two-year contract in 2019 that went to October 31st of 2021. That was it. And everything Brian received after this so-called separation agreement was in conformity with the second year of his contract. Thank you. Sorry. Can I just add one thing? So your argument is this contract is void, right? So this release is void. Where does that leave us? They had a two-year contract with Brian Ball. They didn't have to renew it. No, they didn't. It just leaves a two-year contract at that point. You're correct, Justice. There is no renewing. But because of that memo, if you read the memo, there is an issue there as to whether or not – Well, let me put it this way. They did ratify it. But if the separation agreement is void, it wouldn't be necessary to ratify it again because the suspension was lifted by the commissioner. So where does that leave us? Your client gets his two years because you're saying this contract was void so the two years continues. It gets paid out. And he did, in fact, get paid out and take those benefits. Presumably he's not working for the SACs and it hasn't been for some time. They didn't renew his contract. It expired. So what's the – What's the injury? Did they fire him or did they not? Because if you're saying this doesn't count, he was still their employee. Where does that get you? Are you getting your cake and eating it too by saying he gets full contract and just because they said he was fired doesn't really mean he was fired, but we're still going to sue on that front. Well, I don't think the Chicago Whites Act should walk away because they openly terminate someone on the basis of their sexual orientation. I don't think they get a free pass. And I don't think – like I said, it has ramifications that go far beyond Brian Ball. It goes beyond to the whole LGBTQ community. But you don't disagree that the day that two years was up, they didn't have to renew it. They didn't have to give a reason why they weren't going to renew it. He had no entitlement to a job. That's correct, as long as it wasn't because he was a homosexual. They can't later on say, well, we're going to renegotiate a contract with you. No, but they didn't have to renew it and they didn't have to give a reason, correct? No, they did not have to give a reason. But in this case, they did give a reason. There's witnesses who have testified to that.  Thank you. Well, and just one more thing. They're arguing too that Mr. Ball knew about this issue of him having been fired based on his sexual orientation. I believe within two months of the termination. But yet, they're arguing that he continued to receive that consideration, continued to receive those payments, continued to receive health insurance for the entire period. And then a lawsuit was filed once that period had passed. And they're arguing that that was all done in an effort to retain the consideration and still file a lawsuit. But then I want to point out that you argue that the separation agreement is separate from that. Because what we have is we have discrimination based on sexual orientation. And your position is that that has nothing to do with anything because we're talking about fraudulent concealment of material facts. You want to explain your argument to us? Because it was there, we understood it, but I don't think it was crystal clear. Sure. The illegal act is the White Sox terminating Brian Ball because of his sexual orientation, that being homosexual. To buffer that with, they concealed, they fraudulently concealed the true reason for Brian. If they told Brian, hey, we're going to terminate you because you're gay. Do you think Brian's going to sign the separation agreement? Of course not. So that's why they did it. As far as the payments and as to salary and as to health benefits and things like that, he was entitled to those based upon the second year of his contract. Up until I think October 31st of 2021, that's when that contract expires. He was entitled to those payments. That's not consideration. That's what he received. The fact that the separation agreement flowing from the illegal act is also void because it's illegal. I think the restatement, if I have that with me, says it rather better than I can. It's rendered void as against public policy as part of a general scheme to bring about an unlawful result. That's what happened here. It was a general scheme to bring about an unlawful result. So whatever he was entitled to, he received. The consideration, A, wasn't there because the agreement, separation agreement, is void. It's like it doesn't exist. And all we have is the second year of his contract. And he received everything, pay, health benefits, whatever, in accordance with the second year of his contract. So ultimately, if this case went to trial, then it seems like there will be a setoff there. Because if you're saying that the agreement is void, then he would need to pay back everything that he's received from them. Potentially there could be a setoff. And my position has always been that this whole argument about the separation agreement could be an affirmative defense that they bring. But it should not strike three for Brian Ball on his right to bring a lawsuit in regard to sexual discrimination. All right. Any other questions? All right. Thank you, Mr. Winters. Mr. Chick? You're mute. Good afternoon, Justices. I want to start by saying that attached to the plaintiff's complaint were two key documents. One of them was the UEC itself, and the other one was his separation agreement. The UEC states that if an employee is terminated for cause, he does not receive any of the remaining salary in the UEC. It's written in the agreement that was attached to the complaint. What was the cause? Thank you. I'm going to give you that. So, Your Honor, cause is also defined in the UEC. And what cause says is that if the UEC is suspended or terminated, and the individual is terminated during the suspension or the termination, there is no continuation of salary. That is in the briefing. I'm not sure I understand. He was working there. He was working. In fact, when he was attacked, he was on a mission for the stocks. And he went home to get his notes. I don't understand your argument, because they continued to pay him. He was paid. He was an employee all the way until Han spoke to him on October 26th. Am I missing something? Yes, Your Honor. So, Your Honor, when the UEC gets suspended, at that point, the Commission of Baseball sends out a memo saying that going forward, your baseball team individually would decide whether or not they would employ you outside of the UEC. So, he had no contract that was in effect. But we don't know that. That's a question of fact. I don't know anything about the letters there. There's no testimony. This is only on the papers, right? So, it seems to me you're making an argument that we can't consider. How can we consider your argument? Tell me why that should be considered, because it's just a piece of paper. It's an agreement. We're not even sure. Mr. Winters isn't even sure, you know, what this all is about. He mentioned that. I'm not clear on why we should even consider that. Well, Your Honor, the UEC itself, the contract, says that if the contract is suspended or terminated and the individual is terminated during that period of suspension or termination, no continued salary is required. So, yes, they can employ him, but the contract does not require continuation of pay if they terminate him. Well, I'm not sure. I mean, that is a question. Isn't that an issue for the trial court? How do we get to that issue? Tell me. Give me a statute, a rule, give me a case. I don't know if you caught one in your brief. Tell me. It's contract law, Your Honor. No, that's not an answer. Tell me a rule. Tell me a statute. Give me a case. Is it in your brief? Not a statute, Your Honor. What's in your brief? What's in your brief? What's in my brief, Your Honor, is that the contract at issue, once it's suspended, and it was suspended by the Commission of Baseball, that is in the complaint that Mr. Ball filed. Is it an attachment to the complaint? No, inside of his complaint, he wrote that his UEC was suspended. He wrote that himself in the complaint. The UEC that was attached to the complaint says the effect of the UEC being suspended is that the ball club is not obligated to pay out the salary if they fire him. But I think you're, again, I don't think that's an issue for us. Again, you're not giving me any case law that we can consider that issue. We're here on a motion to dismiss under 619. So we take everything as true. And the issue here, to me, one of the major issues, let's get to the major issue, is the question of what obligation did the White Sox have to tell Ball the reason for his termination? Okay. Your Honor, it's twofold. First, there is no obligation for an employer to tell an employee, I'm firing you because you're Black. I'm firing you because you're a homosexual. There is no such duty to speak. And Illinois law says there can be no fraudulent concealment of fact unless there is a duty to speak. There is no such thing. No, wait a minute. Here, I'm contested. We have to go on what we have before us. There's an affidavit, unresponded to by the White Sox, that says, and we just heard it from Mr. Winter, Han said that I did not fit in the organization's plan to get to the next level. I asked for an explanation, especially in light of the fact that I was one of two trainers on staff during the 2005 World Series championship season. No explanation was provided. So he asked a question, and the answer was he didn't fit in. Now, if that's a pretext, isn't the law trying to stop firing because you're Black, firing because you're gay, isn't that exactly what this statute in Illinois is for? Those are two different things, Your Honor, yes. The statute, the Illinois Human Rights Act, prohibits discrimination. The question is, is there a requirement that an employer make an admission that this is the reason why I'm firing? He asked a question. So the question is, how can you agree, the law says it must be given his consent to that agreement. It must be both, knowingly and voluntarily. Am I correct? Yes, Your Honor. Okay. So let's not talk about the volunteer. Let's look at knowingly. Now, knowingly, if he asks a question, a direct question, and the answer is you don't fit in, and then he finds out later that that is not true, which is what the allegation is in the complaint, right? It would fall to conceal. They did not give him the truth. So how could it possibly be knowingly? Tell me what case would say that that's knowingly when they, this is the allegation, I'm not saying they did or didn't, but the allegation is they lied to him. Your Honor, his consent to the separation agreement was that he agreed to waive all claims. That's not the question. Wait, wait, wait. Don't answer my question, and you can go on. My question was, under the circumstances here, when he was told he didn't fit in, which we have to accept, and the real reason was because he was a homosexual, how could that be knowing? He was not told the true reason when he asked. He said they have no obligation to volunteer. That's what you said. But when asked, and if they say something, which they did, according to the allegations, tell me how that could be knowingly. What definition are you using for knowingly? How do you get there? Well, Your Honor, I stay with the requirement of the duty to speak. We had no, again. No, no, but you did speak. Wait, wait, wait, but you spoke. Mr. Hahn spoke. Am I correct in the allegation? He did. Okay. So if he didn't, he spoke. So once you speak, you can tell an employee, well, just mix something up. And that's the purpose of the act, is so that people are not fired because of race or sexual orientation, because they're female or whatever else, lots of categories. That's the reason for the act. And so when somebody asks, and they are misled, which is what the allegation and the complaint is, isn't it? But, Your Honor, if that was the standard, then no settlement agreement, no separation agreement could ever be valid. Because an individual could always say, well, I was told that I didn't fit in. That's why I was terminated. I accepted the money, but I believe that there was a different reason. They have to prove it. Anybody can say that. People say those things all the time, but that's why we have a court of law, and that's why we have proof. And so the question here is not the proof, right? This is a motion to dismiss. You'll have your opportunity to later on. But as to the record before us, you agree we have to accept everything here, all the facts as true, correct? Yes, Your Honor. Your Honor, contrary facts that Mr. Hahn did not say, you don't fit in here. There's nothing contrary. So if that's the allegation, and they're saying that they broadly concealed the real reason, if they wanted to do that, there's consequences. That's what the law is all about. So I'm just trying to figure out, you know, you keep going, well, they don't have a duty. But if they say something, don't they have a duty to speak good faith and fair dealing? Isn't that a duty in Illinois? You shouldn't lie to your employees about their employment. Again, Your Honor. Yes or no? Yes or no, and then you can answer. There is, Your Honor. Okay. But this is about settlement, and settlement is Illinois public policy, and people settle cases on imperfect facts all the time. It's not imperfect facts. So you're saying that Illinois law, if we go with your side, then you're saying, we're saying Illinois law allows employers to lie to their employees at the time of settlement. Is that, am I correct? What I'm saying, Your Honor, is that representation would not matter. So you could say anything, anybody could say anything in a settlement negotiation, and it doesn't matter. Is that your position? This was not a settlement negotiation, Your Honor. Oh, okay, so it was a take it or leave it agreement. So when they give them an agreement and they say to them, you don't fit in, that's okay, even though it's not true. Is that the position of the White House? Your Honor, the conversation that he's speaking about is not the conversation where he was offered the severance agreement. Those are two different conversations. What I'm saying is that when he was offered a severance agreement, he had an opportunity to evaluate it, and it said that he would release the plaintiff. I'm just trying to keep you on where I am. Yes, Your Honor. October 26th. Paragraph 9 in the affidavit talks about that date, and it says, Han contacted me by phone, informed me that I was being terminated from my position as head trainer for the White Sox. Anything wrong with that statement? No, Your Honor. Okay. Initially, Frederick Han did not offer a reason for the discharge, but I continued to press him for a reason as I was confused by what was transpiring. Finally, Frederick Han said I did not fit in the organization's plans to get to the next level. I asked for an explanation, especially in light of the fact, and I've read that before. So, again, we have to take that as true. Now, taking that as true, you're saying that in the negotiations, and this is part of the negotiations, they can mislead, deceive the employee? Am I understanding that? What I'm saying, Your Honor, is that an employer does not have an obligation to say, I fired you because you're a homosexual. I fired you because you're black. What I'm saying is that an employer does not have that duty to make those admissions. And what I'm saying, Mr. Honor, is that— Mr. Jackson, you said a couple of times that people have a right to engage in settlement agreements, but then you went on to say that this wasn't a settlement agreement. If it wasn't a settlement agreement, what was it? No, Your Honor, that's not what I was saying. I was saying that— You made that statement earlier. You said this was not a settlement agreement. If it wasn't a settlement agreement, what was it? Well, it is, Your Honor. And you deceived me when you said that. You agreed to a settlement agreement. It is. Yes, Your Honor. Okay, so let's back up a second. Okay. When the baseball commissioner gave all the teams permission to do as they pleased in terms of whether they were going to continue these contracts or terminate these contracts, that's correct, right? No, Your Honor. It wasn't continue the contract or terminate the contract. It was continue a relationship with the employee. The contract itself was suspended. The individual clubs had no authority to unsuspend the contracts. The contract flows from the powers—and all of this is inside of the UAC—from the commissioner of baseball. So what they could do is employ him as an admiral employee going forward, which is what they did. But they could not reinstate the contract, Your Honor. And he's not made an allegation that they could. That's not what happened, Your Honor. They were able to employ him as an admiral employee going forward. The contract remained suspended. Mr. Jackson, what do we know about him? What did Mr. Ball know about him being an admiral employee? Is there anything in the record that says we had a meeting, all of our trainers knew this, our people who were subject to this uniform contract understood? If we had them show up for work, we were doing it on our own terms, their papers changed. Is there anything like that? There is, Your Honor. There were e-mail messages that were sent out to not only to Mr. Ball, but a lot of individuals were impacted by this. No, no. The question was if that's in the record. You're saying— It is, Your Honor. There's affidavits. There's two affidavits from—one affidavit is from plaintiffs, one of them is from Defendant Hahn, and the other two are from White Sox representatives, in-house counsel, and Mr.—I might mispronounce his name—Pilsner? He's no longer a defendant, Mr. Jackson. You realize that, right? Yes, Your Honor. Okay, but you represent Defendant Hahn. Former defendant. He's no longer a defendant. Correct. And there were e-mails that were sent out saying, we have decided to continue to pay individuals for another three months. Another e-mail went out. We've decided to pay individuals for another month. That is in the record, Your Honor. So, yes, not just Mr. Ball, all the employees understood that their continued employment was at the discretion of the White Sox, and there were e-mail messages— That's one of the arguments that's being made, though, is that Hahn basically—now, whether or not it was in writing is another question, but he promised him that he would be able to continue on, and that he would continue to get paid, and that he didn't have anything to worry about. But again, Your Honor, that's as an at-will employee. You can make an expression of, this is what I hope, this is what I intend, but that's not a guarantee of employment. In Illinois, a guarantee of employment has to have definitive terms. There were none. Saying that, you know, we think we're going to be here for a long time, that's not a guarantee of employment. A guarantee of employment was the UEC, but that was suspended, Your Honor. And instead, he received e-mails, like everyone else who had a suspended UEC, saying, this is how long we intend to continue paying folks on the UEC. So, utilizing the argument you're making right now, you have not clearly made that argument in your brief. Well, Your Honor, that's because the issue of whether or not he was an at-will employee or not an at-will employee was not an issue that the plaintiff raised. So, we didn't have as an error by the court. So, we didn't have a basis to write about that in our brief. We wrote that the UEC was suspended. It was no longer in effect. It's a bit, and I'm sure that Justice Hyman and Justice Kemmel will agree with me, it's a bit odd for us to hear an argument, an oral argument, that we've not read it in the briefs. That doesn't happen very often, that you even raise this argument and you didn't argue it in your briefs. And, again, Your Honor, I didn't raise it in the brief because there was no opposition argument to be made. He didn't argue that in his opening brief. So, I didn't have a reason to argue in the opposition brief. But it's in the record. But you're now saying that somehow that's relevant. Otherwise, you wouldn't have raised it. I was asked if it was in the record, Your Honor, and it is. So, but it's not relevant, apparently, because you didn't raise it. Nobody raised it. So, let's go on. If I understand your argument now, you're saying, let's accept what you said, that the White Sox, he was an employee at will in October, and they could terminate him for any reason. Okay? Let's just add a little. Under Illinois law, can they terminate him because of his sexual orientation? Period. No. Okay. So, now he's alleged that that was the reason that he was terminated. So, why can't this case go forward? Because he was not knowingly, he was actually misled as to the reason for his termination. That's the crux of his complaint. That's the crux of his complaint. All we're saying here, whether he wins or loses, we don't know. That's not our issue. Our issue is, does he have enough here to move forward to go to trial? That's the issue before us. You would agree with that? I do, Your Honor. Okay. But why would Illinois law allow the White Sox to mislead someone on the reason when you just said, no, that's not a proper reason under the law of Illinois. And again, Your Honor, it's not that allow a reason. It's a duty to make the representation. It does not exist. If that were true. The duty, you don't, you have a duty of fair, of good faith and fair dealing in contracts, right? You have a duty among yourselves not to mislead. That could be fraudulent concealment and a lot of other fraud, misrepresentation, so forth and so on, right? He asked the question. And right now, before us, there's a, Mr. Hunt said, I did not fit in the organization's plans to go to the next level. That's what he would say. He could have said, I don't, I can't tell you the reason. He could have said nothing. He could have ignored the question, but he did. So he was told that and he knew that when he accepted the agreement, right? He didn't know anything else. Okay. And, Your Honor, what happened two months later after he found out that, according to an unknown representative, that I was really terminated because I'm a homosexual? What did he do? He did nothing. Under the terms of the UEC, if he had said, you know what, I feel that I was terminated for an unlawful reason and that the White Sox have an obligation to pay me, he had an obligation to write to the Commissioner of Baseball and say, I'm going to demand arbitration because I should be paid. No, wait, wait, wait, wait, wait, wait. Why am I wrong? You just told us that that agreement was terminated. And now you're telling me he has to write to the Commissioner of Baseball because it's not terminated? No, Your Honor. What I'm saying is, if he believes that he should have been still paid under the suspended contract, if he believes that when he signed a separation agreement, he should have received the money anyway, he should have wrote to the Commissioner of Baseball and say, I found out that my employer terminated me because I'm a homosexual. I signed a separate— You're saying—but you went it both ways, is what you're telling us, that either there is no agreement with the Major League Baseball or there is. And either way, you win. Is that accurate? No, Your Honor. What I'm saying is he needed to do something. Which way do we go forward? Just tell me. He didn't do that. But why would he, if you're right, that the White Sox—I mean, either you're right one way or you're wrong one way. You can't have it both ways. Okay? So which one is right? Which one are you going under? So we know, when we reread your briefs, what your position is. Is your position that the baseball uniform contract employees is still in effect or is it not? What's your position? My position that it was suspended. Suspended. Okay. So if it's suspended, he did not have to do that, did he? If he believed that he was owed money— Everybody's believed. We don't get into bleach right now. All we have is the facts before us. Okay. But that's what's in his papers, Your Honor. Wouldn't that be something that Mr. Winters does mention in his brief? That he says that, first of all, the trial court dismissed this case because he had signed that separation agreement. Do you agree with that part? Yes, Your Honor. Okay. But this case that's before the trial court has nothing to do with this. This is Mr. Winters' argument, not mine. I want you to respond to it. Has nothing to do with the separation agreement. This is really a separate claim based on firing someone simply because of their sexual orientation. And that what happened with the separation agreement means nothing. Now, that's not this court's argument. We don't argue. We listen. That's his argument. We listen, we read. And that's what he's arguing in his brief. Respond. The separation agreement is the document where he waived that very claim. The separation agreement— Not specifically. Not specifically. The claim didn't address—the separation agreement didn't address sexual orientation. We read it. All of us read it. The three of us read it already. Okay. We don't want the separation agreement because it says nothing about sexual orientation. What it says, Your Honor, is that he releases all claims, all charges of discrimination, and all claims arising under the Illinois Human Rights Act. That's the only way you can raise a sexual orientation claim is under the Illinois Human Rights Act. There's no other way to assert that claim. And he waived it expressly, Your Honor. But doesn't the Human Rights Act say that people have—there's a law in Illinois that you have 21 days, right, to consider? So what if I said to him, you have seven days? Is that right? No. He said, if you don't respond in seven days, we're going to rescind. Is that right? When you ask me if that's right, you ask me if— That's the allegation. Is that before us? That is an allegation. Okay. So if that's true, that's what we have to take as true, would that alone take everything out? Because there's a violation because it says you get 21 days, and then you get seven days after that, an additional seven days. And you have the 21 days to file a lawyer and everything else, and he was called, and he had very little time to consider this. So, I mean, we can't pick and choose which rules we're going to apply. Yes, Your Honor. So you have to apply here, too, as well. Okay, Your Honor. On that issue, the separation agreement has a provision in it that says you are—and this was in bold print—advised to speak to an attorney before you sign this agreement. That's at the very top of the seventh agreement that was attached to the complaint. But the law says that, too. You have that right, yes. But I lay it on my question. My question is, the 21 days in Illinois law, and the White Sox said, if you don't get back to us in seven days, we're withdrawing. Understood, Your Honor. What the contract says later on is that you agree that no representation made outside of the four corners of this document have been relied upon in your decision to accept or reject this agreement. It's in the agreement that he cannot rely upon any oral representation in considering whether or not he wants to take the agreement. So what happens? So you can lie to him. You can call him and tell him anything you want. So apparently the act really doesn't apply here because I'm just—nothing applies, right? Because the White Sox—this agreement is so thorough that no matter what the White Sox lie or do, pressure put on them—the whole idea is not to put pressure on people. It's to give them 21 days. But if they already give them seven days, that's okay. So that's not a violation of the act. I'm not saying that, Your Honor. What I'm saying is— Okay, so that is an issue. So we should at least send it back for that issue to be considered. No, Your Honor, because Illinois law says if you—there is a document attached to the complaint, which the separation agreement is, that says he's given the 21 days. That document also says you're not to rely upon any statement made outside of this agreement. How can you hear both? How can you hear both? To me, wouldn't that be a violation of Illinois law? Illinois law says 21 days. And you're saying, well, we can unilaterally—because Mr. Ball had nothing to do with this agreement. You agree. He didn't change one word on it, did he? No. So this is a give it or leave it. We're going to take away that right. You don't have 21 days under the law because we're going to say—so every contract from now on is going to say you can't rely on anything that the employer says. And you're saying that's free and clear. So that's a ticket away from any kind of violation. Is that true? No, Your Honor. What I'm saying is that he agreed in signing the contract that he had not relied upon any representation outside of the agreement. I'm saying that the agreement in writing advised him that he had 21 days to consider the agreement. But the White Sox said you don't have 21 days. The White Sox said you have seven days. Either—we don't know if they did or didn't, but that's the allegation, and we have to accept that. So you can't have it both ways. You can't say, well, he gets 21 days, but then the White Sox put pressure on him and said, we're withdrawing this in seven. Now, if that happened to anybody, I think they would think, oh, I only have seven days. I mean, it's natural. But, Your Honor, the whole purpose of interpreting contracts is that we read what the contract says. There's nothing ambiguous about it. And what he's doing is talking about—he was given terms and conditions outside of the contract that were unlawful. The contract reads for itself. It said— It can't read itself. That's why we're here, judges and lawyers, right? That's why we're here, interpret contracts. And that's what we're trying to do here. So, again, in interpreting this contract, that's a question. And, again, these are allegations. And an interpretation needs to be made. It seems to me what you're arguing now is, yeah, this should go ahead because there are a lot of open questions as to this particular agreement. And you're just, to me, emphasizing the difference between you and Mr. Winters with regard to the interpretation of all these allegations that are in the complaint and that are in the affidavits. And that's not for us to deal with. We just—we would just send it back and let the trial judge go from there. I want you to—if there's anything you want to say, I mean, I'm not— Again, Your Honor, I just stress that the separation agreement told Mr. Winters—excuse me, Mr. Ball—that he could not rely upon any statement, that he agreed that he had not relied upon any statement. He agreed in writing that he hadn't relied upon any statement outside of the contract. I have a question. I have a question. Did the agreement say that he could not rely on any statement by Mr. Hahn? No, it didn't say Mr. Hahn's name specifically, Your Honor. But I'm saying before the agreement, before the agreement, it has nothing to say about any statement by Mr. Hahn, right? By the way, before the agreement. Before the agreement. No, there was nothing in writing saying that he couldn't—no, Your Honor. Okay. Any other questions? Yeah, let me ask you. We heard Mr. Winters' argument about ratification. Are you making an argument about ratification? In other words, did Ball ratify his severance agreement by accepting the benefits? Did you make that argument? Yes, Your Honor. The argument that we made was that according to the allegations in the complaint, he signed the contract in October. Two months later, according to the complaint, he learned from an unknown representative that he was actually fired because of his sexual orientation. Our argument is after obtaining that information, he did nothing. He continued to accept the payments. He did not return them. He did not tell the White Sox, I think that you guys have misled me. Instead, he took the January check, the February check, the March check on through October of 2021. He also accepted the health care benefits from April 1st of 2021 through October. He kept everything, and only after the White Sox paid him everything they agreed to pay him in exchange for releasing his claims did he then say, you know what, I think I've been wrong, and now I'm going to file a lawsuit. Illinois law says you can't do that. If you believe that there's a defect in the formation of a contract, which is what he alleged, Illinois law says you have to step forward and revoke that contract. You have to act in a way inconsistent with you ratifying the conduct that you're complaining about. He didn't do that. He kept over $100,000, he kept the benefits, and then he complained. Illinois law says you can't do that. Mr. Winters says he can because the contract was still in effect. Am I correct that your argument is the contract was not in effect because of the commissioner's suspension? And once he got suspended, he became an out-of-job employee? Correct, Your Honor. And these are allegations that are in the complaint. It's not just me saying this, Mr. Ball's complaint says that in March of 2020, the Commission of Baseball suspended all UECs, not just his, everyone. That's not only admitted in the complaint, but then the attachment to the complaint is the UEC itself saying once the UEC has been suspended or terminated, no further pay is required. And what we're arguing, Your Honor, is that once he acquired this knowledge that he claims to have acquired, he should have been jumping up and down to tell the White Sox, you've misled me, I'm revoking this contract. He didn't do it. If he believed that the money was already owed to him, he should have wrote to the Commissioner of Baseball and said, I think that this money is something that I'm already owed. I disagree with the White Sox interpretation of my rights and their obligations. He didn't do that. That's undisputed. He accepted the money, every nickel of it, and then said, thank you very much. Now I'll sue you 10 months after knowing that I believe you misled me. Illinois law says you can't do that. And it might correct that your position is once that contract got suspended, he became an acquittal, and you could have fired him the next day because the UEC contract says you can't if the contract is suspended or terminated. Not only is that my position, Your Honor, the UEC says it. The UEC has a for-calls provision written in it, and the UEC says just that. You don't have to pay the person going forward. Oh, sorry. I was just going to follow up, because in his affidavit, Paul says, with regard to what you just said, the May 1, 2020 date, Commissioner Manfred suspended all uniform employee contracts. It says, I was informed that I would continue to receive any full salary in the regular manner, and all my benefits would remain in effect. Yeah, Your Honor, they didn't give any employee a pay cut. They just kept everybody on with the same terms and conditions that they already had. That was consistent for all the employees in the organization. But that's not a ratification. Well, if they kept everybody on with the exact same terms as they already had, wouldn't that take him to October of 2021? When I say terms, Your Honor, I mean the pay and the benefits. They didn't say, now we're going to pay you $5,000 a month instead of $10,000 a month. You should finally say that, though, because you make it sound like the term was that he had a contract. Understood, Your Honor. The terms of his compensation remain the same, Your Honor. Not the length and not the guarantee. And again, that argument is still out there that this is really just a totally – this is a different case from that. That maybe pursuant to the issues you're raising regarding him continuing to receive the funds, even though he knew two months after he was terminated, that maybe that's the whole set-off thing that I discussed earlier with Mr. Winters. You can respond to that if you have a need to, if you want to. It's up to you. Sure. So when it comes to set-off, Your Honor, a set-off normally occurs, as you know, when someone has something like interim earnings. But here it's not about set-off. It's about the fact that he accepted the deal that he signed once he did nothing. Once he decided to keep everything that was given to him, he then said, I'm fine with the deal. I agree. He cured the defect, Your Honor, to the extent that there were any. That's the whole point of the ratification. He argues that this whole process was tainted. If the justices take that at face value, the next question becomes, what did you do once you learned the whole process was tainted? And the answer is, Your Honor, I did nothing. I continued to take all of the White Sox money until it was all gone, and then I sued. Illinois law says you can't do that. Well, if it says that, it has to give you a statute of limitations, right? Is there something that you're aware of that says you must do something in a certain number of days or weeks, months, years? What the case law in Illinois says is if you keep the money for any reasonable length of time, once you know of the defect, you've ratified. And in the breach, Your Honor, we point out cases where I believe the person kept for a matter of months and there was ratification. Here, Mr. Ball has kept that money for years. Well, he filed a lawsuit, but after 10 months. But that's a question of fact, isn't it? Well, Your Honor, he didn't file a lawsuit after 10 months. After 10 months is what I'm saying. He then filed a charge of discrimination and everything.  OK, no answer. But isn't that a question of fact for the trial court to decide? Well, no, Your Honor, not ratification.  But the judge did not consider ratification, right? Judge Donnelly did not make a decision on ratification. Yes, Your Honor. Yes, Your Honor. Let's go back and read the transcript. What we argued, both in the papers and an oral argument, Your Honor, what I argued was even if the court were to take into consideration all of the things that plaintiff alleged, he has still ratified the contract through his conduct. My question is, did Judge Donnelly decide the issue of ratification? Judge Donnelly agreed that Mr. Ball ratified the contract. Did he say that? I don't remember reading those words. I don't have the transcript in front of me. We'll go back and read it. I just don't remember him specifically saying that that's what he was ruling. And I heard you say that that, you think, is a question of law. Doesn't ratification have that reasonableness provision? So if I accept benefits for three months or three years, it really depends on the facts and circumstances as to what's reasonable? It does, Your Honor. But these cases have been decided on a motion to dismiss, not on summary judgment. And we cite to those cases in our brief. So they've been decided as a matter of law at the pleading stage. Any other questions? Thank you, Mr. Jackson. Mr. Walters. You did the same thing Mr. Jackson did. So now you're even. And I appreciate it. It's very nice of you to do that. I appreciate it. Mr. Jackson appreciates it. And look, I'm not going to say anything. Look, I've done it too. Justice Walker, you've done it. I don't know what Justice Gambert is telling us. But we've all done it. Those are probably some of my best words, too. I'm going to be very brief. Counsel brought up this at-will argument. I don't see at-will listed, those terms, at-will listed anywhere. And I did some extensive search in regard to the documents that we have attached to the briefs. I don't see at-will. What I do see are e-mails that were sent out by Ms. Foy, who is Human Resources, and Howard Pizer, the VP of Baseball Operations for the White Sox, that was sent to non-uniformed employees, which Brian is not, a uniformed employee contract. There's, on those e-mails, check them out, there's nothing in there that has Brian's name on there. Brian did not receive any of those e-mails. I just want to make sure I'm following you.  What you're saying is that the e-mails Mr. Jackson referred to were to non-uniformed employees, not to uniformed employees, and they considered Ball a uniformed employee. Therefore, they have nothing to do with Mr. Ball. Right. Is that what you're saying? That's what I'm saying. And Brian never received any of those e-mails. In fact, if you read the transcript, I asked to take the depositions of Ms. Foy and Mr. Pizer because I wanted to go into those issues, but the court denied me. The entire argument that I'm hearing about the ratification of the monies that Brian received, monies that he was entitled to under the second year of that contract. And once again, I want to point out that the legal conduct, the legal acts of the Chicago White Sox in terminating Brian because he's a homosexual creates an illegal separation agreement. Once again, and I'll read exactly from the restatement, and a separation agreement is a contract. I believe we can all agree on that. A contract, which in itself is not unlawful, either in what it promises or in the consideration for the promise, may nevertheless be rendered void as against public policy as part of a general scheme to bring about an unlawful result. That was a general scheme. The unlawful result is terminating Brian because he's a homosexual. That is the unlawful result. And I think, Justice Walker, you were referring to, I think, the King versus Gerber Realty case where there was a violation of the Consumer Fraud Act, and they used a separation agreement with a release clause in it that the court found to be against public policy, indicated that it was deceitful and unscrupulous. But it did say that basically that part, the separation agreement, could probably be used as an affirmative defense. And that's what I'm saying here. No matter what. Pardon? Okay. Mr. Jackson is a very good speaker, and I listened to everything he said, but the one thing that keeps haunting me is we're talking about the law here, not the White Sox law. It's like there's law for the White Sox and law for everyone else. Mr. Winters, if we peel back the layers of the umbrella, you say the separation agreement is illegal because it was based on the legal side. So, Mr. Jackson says, well, the contract itself was suspended. Do you disagree that the uniform contract was suspended? You say in your complaint that it was suspended, and the contract itself says that if it's suspended, you fall back on what happens team to team. So, in this case, you don't allege that Mr. Ball got a new contract. You said he just continued to get paid. So, when you say he was always entitled to that contract through 2021, was he really because you admit it was suspended? Well, it was suspended. It was not terminated. Okay. There's a difference. And in fact, the suspension was lifted the following April before the season started sometime before the season started by the commissioner of baseball. So, all suspended contracts were lifted. Would that have been in April of 21? Correct.  So, what I'm saying is there was a suspension of the contracts, and I disagree with opposing counsel on what the memorandum of the commissioner of baseball says. It says it's going to be each team's individual on how they're going to handle this, and you're going to hear from them. Okay. Well, Brian heard from them. You're going to continue to get paid in this manner, the same manner you've always been paid, and it's always going to be with the same salary, same benefits, and I believe that's ratification at that point. The agreement, or strike that, the memorandum of the commissioner of baseball does not say you can fire anyone for anything, including discrimination. You can fire anyone because they're homosexual. It doesn't say that. You know why it doesn't say it? Because that is not what the law says. So, I believe that there are many issues of fact here, and I think that the court has pointed that out, and it should be returned to the trial court so that we can proceed. Do you know the answer? Did Judge Donley decide the issue of the ratification? I did a quick search in the transcript, and I only saw ratification under opposing counsel's name, meaning he said ratification. I don't see one time where Judge Donley said ratification. So, I don't believe he decided anything on ratification. Was it included in counsel's argument? Certainly it was. And from what I could take, if you look at the transcript, Judge Donley, at least when speaking to me, and I believe he cut me off several times on my illegal argument that I believe that everything was an illegal act and that the separation agreement flows from that and makes it illegal, but he talked a lot about that there's public policy that these separation agreements need to be enforced, and that's where he kind of left it with me. And the only thing I tried to respond is what public policy is greater than protecting a class from discrimination? I can't think of any. Any other questions? I want to thank both of you, Mr. Jackson, Mr. Winters. We asked you a lot of tough questions, and you're both fine attorneys. So, appreciate it. Appreciate your briefs. We gave you an hour and a half almost, which is, you know, I said sometimes we go longer, and I'm glad I warned you. So, I really appreciate your working with us and your patience, and we'll take this under advisement. You've given us a lot to think about. So, I appreciate it. Thank you very much. Thank you, Your Honor. Thank you, Justice.